# 19 MAG 1315

ORIGINAL

Approved: _____
DANIEL H. WOLF
Assistant United States Attorney

Before:   HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

------------------------------------X
                            :
UNITED STATES OF AMERICA      :   **SEALED COMPLAINT**
                            :
         -v.-          :   Violations of 18 U.S.C.
                            :   §§ 1349, 1028A, and 2
RICARDO TABOADA, and       :
DANIEL DURAN,            :   COUNTY OF OFFENSE:
                            :   BRONX
            Defendants.   :
                            :
------------------------------------ X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     ASHLEY L. BOROFSKY, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Bank Fraud)

    1.    From at least in or about April 2017 up to and including the present, in the Southern District of New York and elsewhere, RICARDO TABOADA and DANIEL DURAN, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

    2.    It was a part and an object of the conspiracy that RICARDO TABOADA and DANIEL DURAN, the defendants, and others known and unknown, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises,

in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Aggravated Identity Theft)

3.    On or about April 26, 2018, in the Southern District
of New York and elsewhere, RICARDO TABOADA and DANIEL DURAN, the
defendants, knowingly did transfer, possess, and use, without
lawful authority, a means of identification of another person,
during and in relation to a felony violation enumerated in Title
18, United States Code, Section 1028A(c), to wit, TABOADA and
DURAN used the identifying information of Real Person-1 during
and in relation to the conspiracy to commit bank fraud charged
in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b)
and 2.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

4.    I am a Postal Inspector with the USPIS, and I am one
of the agents responsible for this investigation.  I have worked
for the USPIS for five years.  During this time, I have
conducted numerous investigations into various financial frauds,
including bank fraud, and am familiar with the ways in which
such crimes are committed.

5.    I have been involved in the investigation of this
matter, and I base this affidavit on that experience, my
conversations with law enforcement agents, witnesses and others,
as well as my examination of reports, records, and recordings.
Because this affidavit is being submitted for the limited
purpose of demonstrating probable cause, it does not include all
the facts that I have learned during the course of my
investigation.  Where I relate the contents of documents and the
actions, statements, and conversations of others, they are
reported in substance and in part, except where otherwise
indicated.

## The Scheme to Defraud

6.    Based on my review of financial records concerning
RICARDO TABOADA and DANIEL DURAN, the defendants, and others
known and unknown, my review of bank records related to

2

automobile loans applied for by, and issued to, certain
individuals (including but not limited to applicants referred to
herein as the "Borrower Victims"), my review of materials
obtained from the Office of the New York State Secretary of
State, my personal involvement in interviewing certain of the
Borrower Victims, and my training and experience, I have learned
the following:

        a.     Between in or about April 2017 up to and
including the present, TABOADA and DURAN fraudulently held
themselves out to individuals seeking to improve their credit
scores (identified above as the Borrower Victims) as being
specialized in repairing poor credit and as being able to obtain
personal loans for such individuals.  TABOADA and DURAN worked
out of at least three offices, all located in the Southern
District of New York, where TABOADA and DURAN met with the
Borrower Victims, obtained certain of the Borrower Victims'
personally identifiable information, and convinced certain of
the Borrower Victims to pay TABOADA and DURAN for credit repair
services and to allow TABOADA and DURAN to obtain loans on their
behalf in furtherance of those credit repair services.

        b.     Between in or about April 2017 up to and
including the present, TABOADA and DURAN fraudulently obtained
automobile loans from banks, credit unions, and other lending
institutions (the "Lenders").  The defendants, and others known
and unknown, obtained the loans (the "Loans") by providing
materially false information to the Lenders about the assets of
the borrowers (who included, but were not limited to, the
Borrower Victims), including but not limited to false
information about the borrowers' employment and credit and false
information about the reasons for which the borrowers were
seeking the Loans.

        c.     As part of the scheme to defraud, the defendants,
and others known and unknown, engaged in extensive efforts to
perpetuate and conceal the fraudulent scheme.  These efforts
included, but were not limited to (i) falsely claiming that the
purpose of the Loans was to purchase or finance automobiles
when, in fact, many of the automobiles were never purchased or
leased by the defendants or their co-conspirators, and (ii)
depositing proceeds from the fraudulent scheme into bank
accounts opened by TABOADA and DURAN in the name of fictitious
companies.

d.   As part of the scheme to defraud, the defendants defrauded financial institutions, as that term is defined under Title 18, United States Code, Section 20.

## The Bank Accounts Controlled by the Defendants

7.   Based on my review of documents and information obtained from four national banks, my review of records obtained from the Office of the New York Secretary of State, my conversations with representatives of two real automobile dealers ("Real Automobile Dealer-1" and "Real Automobile Dealer-2," together referred to as the "Real Automobile Dealers"), my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

a.   Real Automobile Dealer-1 is an actual automobile dealer based in the Bronx, New York.  Neither RICARDO TABOADA nor DANIEL DURAN, the defendants, have ever been employed or authorized by Real Automobile Dealer-1 to open a bank account on behalf of Real Automobile Dealer-1.

b.   Real Automobile Dealer-2 is an actual automobile dealer based in the Bronx, New York.  Neither TABOADA nor DURAN have ever been employed or authorized by Real Automobile Dealer-2 to open a bank account on behalf of Real Automobile Dealer-2.

c.   On or about March 8, 2017, a bank account ("Bank Account-1") with a national bank, ("Bank-1") was opened in the name of a limited liability corporation doing business in the name of a variant of the name of Real Automobile Dealer-1. Signature cards on file with Bank-1 identify that "Ricardo Taboada" and "Daniel Duran" are authorized users for Bank Account-1.

d.   On or about June 24, 2017, a bank account ("Bank Account-2") was opened with Bank-1 in the name of a business that is a variant of the name of Real Automobile Dealer-2.  A signature card on file with Bank-1 identifies that "Ricardo Taboada" is an authorized user of Bank Account-2.

e.   On or about January 18, 2018, a bank account ("Bank Account-3") was opened with a national bank ("Bank-2") in the name of a limited liability corporation incorporated in Colorado and accepting process at an address in the Bronx, New York, where TABOADA and DURAN had an office at which they engaged, with others known and unknown, in their scheme to

4

defraud financial institutions and the Victim Borrowers.

        f.   On or about March 20, 2018, a bank account ("Bank Account-4") was opened with Bank-2 in the name of a business that is a variant of the name of Real Automobile Dealer-2.   A signature card on file with Bank-1 identifies that "Ricardo Taboada" is an authorized user of Bank Account-4.

        g.   On or about May 22, 2017, a bank account ("Bank Account-5") was opened with a national bank ("Bank-3", together with Bank-1 and Bank-2, the "Banks") in the name of a business that is a variant of the name of Real Automobile Dealer-2.   A signature card on file with Bank-3 identifies that "Ricardo Taboada" is an authorized user of Bank Account-5.

        h.   On or about October 18, 2018, a bank account ("Bank Account-6") was opened with Bank-2 in the name of a business that is a variant of the name of Real Automobile Dealer-2.   Bank statements issued by Bank-2 in connection with Bank Account-6 indicate the address on file with Bank-2 for Bank Account-6 is an address that matches that of an office where TABOADA and DURAN engaged, with others known and unknown, in their scheme to defraud financial institutions and the Victim Borrowers.

    8.   Based on the preceding paragraph (¶ 7), I believe that RICARDO TABOADA and DANIEL DURAN, the defendants, with others known and unknown, opened Bank Account-1, Bank Account-2, Bank Account-3, Bank Account-4, Bank Account-5, and Bank Account-6 (collectively, the "Bank Accounts") in furtherance of the fraudulent scheme, as well as to conceal the nature of their fraudulent scheme.

<u>Defrauding of Lender-1</u>

    9.   Based on my review of documents and information obtained from a national financial institution ("Lender-1"), my review of documents and information provided by the Banks in connection with the Bank Accounts, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

        a.   Between on or about January 9, 2018, and on or

5

about July 18, 2018, Lender-1 funded six automobile loans (the
"Funded Lender-1 Loans") totaling $172,924.50, proceeds of which
were deposited into Bank Account-1, Bank Account-3, and Bank
Account-4.

        b.    The corresponding applications (the "Lender-1
Funded Applications") for each of the six Funded Lender-1 Loans
were made on behalf of the names of six different individuals.
Each of the Lender-1 Funded Applications falsely stated that the
applicants were seeking to obtain a loan to finance a specific
vehicle (as identified by a unique Vehicle Identification Number
("VIN")) that was sold to the applicants by either Real
Automobile Dealer-1 or Real Automobile Dealer-2 when, in fact,
no such vehicle was so sold to the applicant.

        10.    Based on my review of documents and information
obtained from Lender-1, my review of documents and information
provided by the Banks in connection with the Bank Accounts, my
personal involvement interviewing certain of the Borrower
Victims and review of documents concerning the Borrower Victims,
my conversations with representatives of the Real Automobile
Dealers, my review of documents and information provided to me
by the Real Automobile Dealers, and my training and experience,
I have learned the following:

        a.    Between on or about August 17, 2017 and on or
about May 7, 2018, Lender-1 received two applications (the
"Lender-1 Unfunded Applications") for the financing of vehicles
other than those vehicles referenced in the six Lender-1 Funded
Applications discussed in the preceding paragraph.  Each of the
two Lender-1 Unfunded Applications falsely stated that the
applicant was seeking to obtain a loan to finance a specific
vehicle (as identified by its VIN) that was sold to the
applicant by either Real Automobile Dealer-1 or Real Automobile
Dealer-2 when, in fact, no such vehicle had been so sold.

        b.    The two Lender-1 Unfunded Applications sought,
respectively, two different loans that, in total, amounted to
approximately $73,550.81 in financing.

### Defrauding of Lender-2

        11.    Based on my review of documents and information
obtained from a national financial institution ("Lender-2"), my
review of documents and information provided by the Banks in
connection with the Bank Accounts, my personal involvement
interviewing certain of the Borrower Victims and review of

documents concerning the Borrower Victims, my conversations with
representatives of the Real Automobile Dealers, my review of
documents and information provided to me by the Real Automobile
Dealers, and my training and experience, I have learned the
following:

        a.    Between on or about November 22, 2017, and on or
about December 2, 2017, Lender-2 funded three automobile loans
(the "Funded Lender-2 Loans") amounting to approximately
$106,145.48, proceeds of which were deposited into Bank Account-
1.

        b.    The corresponding applications (the "Lender-2
Funded Applications") for each of the three Funded Lender-2
Loans were on behalf of the names of three different
individuals.  Each of the Lender-2 Funded Applications falsely
stated that the applicants were seeking to obtain a loan to
finance a specific vehicle (as identified by its VIN) that was
sold to the applicants by either Real Automobile Dealer-1 or
Real Automobile Dealer-2 when, in fact, no such vehicle was so
sold to the applicant.

        12.   Based on my review of documents and information
obtained from Lender-2, my review of documents and information
provided by the Banks in connection with the Bank Accounts, my
personal involvement interviewing certain of the Borrower
Victims and review of documents concerning the Borrower Victims,
my conversations with representatives of the Real Automobile
Dealers, my review of documents and information provided to me
by the Real Automobile Dealers, and my training and experience,
I have learned the following:

        a.    Between on or about November 2, 2017, and on or
about December 30, 2017, Lender-2 received six applications (the
"Lender-2 Unfunded Applications") for the financing of vehicles
other than the three Lender-2 Funded Applications discussed in
the preceding paragraph.

        b.    Five of the six Lender-2 Unfunded Applications
were transmitted to Lender-2 from an Internet Protocol address
that connected to the Internet from a physical address that is
the same address as an office in the Bronx, New York, where
TABOADA and DURAN engaged, with others known and unknown, in
their scheme to defraud financial institutions and the Victim
Borrowers.

        c.    The sixth Lender-2 Unfunded Application was

submitted on behalf of "Ricardo Taboada" bearing the actual date of birth of RICARDO TABOADA, the defendant, an email address containing components of TABOADA's name, and supported with paystubs issued by an employer that matched paystubs submitted with other applications referenced herein on behalf of Victim Borrowers and others.

        d.    The six Lender-2 Unfunded Applications sought, respectively, six different loans amounting, in total, to approximately $164,333.95 in financing.

### Defrauding of Lender-3

        13.   Based on my review of documents and information obtained from a national financial institution ("Lender-3"), my review of documents and information provided by the Banks in connection with the Bank Accounts, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

        a.    Between on or about June 26, 2017, and on or about August 10, 2017, Lender-3 funded two automobile loans (the "Funded Lender-3 Loans") amounting to approximately $70,165.00, proceeds of which were deposited into Bank Account-1 and Bank Account-2.

        b.    The three checks issued by Lender-3 in connection with the three Funded Lender-3 Loans identified as a payee, respectively, Real Automobile Dealer-1 or Real Automobile Dealer-2, and bore on their face the names of two individuals to whom Real Automobile Dealer-1 and Real Automobile Dealer-2 have no record of ever having sold a vehicle.

### Defrauding of Lender-4

        14.   Based on my review of documents and information obtained from a national financial institution ("Lender-4"), my review of documents and information provided by the Banks in connection with the Bank Accounts, my conversations with representatives of Lender-4, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of

documents and information provided to me by the Real Automobile
Dealers, and my training and experience, I have learned the
following:

a.      Between on or about May 15, 2017, and on or about
December 2, 2017, Lender-4 funded ten automobile loans (the
"Funded Lender-4 Loans") amounting to approximately $376,539.58,
proceeds of which were deposited into Bank Account-1 and Bank
Account-5.

b.      The corresponding applications (the "Lender-4
Funded Applications") for each of the ten Funded Lender-4 Loans
were on behalf of the names of ten different individuals.  Each
of the Lender-4 Funded Applications falsely stated that the
applicants were seeking to obtain a loan to finance a specific
vehicle (as identified by its VIN) that was sold to the
applicants by either Real Automobile Dealer-1 or Real Automobile
Dealer-2 when, in fact, no such vehicle was so sold to the
applicant.

15.     Based on my review of documents and information
obtained from Lender-4, my review of documents and information
provided by the Banks in connection with the Bank Accounts, my
conversations with representatives of Lender-4, my personal
involvement interviewing certain of the Borrower Victims and
review of documents concerning the Borrower Victims, my
conversations with representatives of the Real Automobile
Dealers, my review of documents and information provided to me
by the Real Automobile Dealers, and my training and experience,
I have learned the following:

a.      Between on or about June 15, 2017 and on or about
February 20, 2018, Lender-4 received six applications (the
"Lender-4 Unfunded Applications") for the financing of vehicles
other than those vehicles referenced in the ten Lender-4 Funded
Applications discussed in the preceding paragraph.

b.      Four of the six Lender-4 Unfunded Applications
falsely stated that the applicant was seeking to obtain a loan
to finance a specific vehicle (as identified by its VIN) that
was sold to the applicant by either Real Automobile Dealer-1 or
Real Automobile Dealer-2 when, in fact, no such vehicle had been
so sold.

c.      Two of the Lender-4 Unfunded Applications falsely
stated that the applicant was seeking to obtain a loan to
finance a specific vehicle (as identified by its VIN) that was

9

sold to the applicant by an automobile dealer other than Real Automobile Dealer-1 or Real Automobile Dealer-2 ("Real Automobile Dealer-3").

      i.   For one of these two applications on behalf of a vehicle purportedly sold by Real Automobile-3, the application was submitted from an Internet Protocol address that connected to the Internet from an Internet Service Provider account held in the name of "Daniel Duran" with an address in Yonkers, New York;

      ii.  For the second of these two applications on behalf of a vehicle purportedly sold by Real Automobile-3, the application was on behalf of a borrower who has admitted to me that she provided her personally identifiable information to TABOADA an DURAN, and the application itself listed a place of employment that is the same place of employment listed on other applications referenced herein as the place of employment for applicants.

     d.   In total, all six Lender-4 Unfunded Applications sought, respectively, six different loans that, in total, amounted to approximately $209,573.45 in financing.

## Defrauding of Lender-5

    16.   Based on my review of documents and information obtained from a national financial institution ("Lender-5"), my conversations with representatives of Lender-5, my review of documents and information provided by the Banks in connection with the Bank Accounts, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

     a.   Between on or about February 21, 2018, and on or about October 25, 2018, Lender-5 funded twenty-five automobile loans (the "Funded Lender-5 Loans") amounting to approximately $876,113.00, proceeds of which were deposited into Bank Account-2, Bank Account-3, Bank Account-4, and Bank Account-6.

b.    The corresponding applications (the "Lender-5 Funded Applications") for each of the twenty-five Funded Lender-5 Loans were on behalf of the names of twenty-five different individuals.  Each of the Lender-5 Funded Applications falsely stated that the applicants were seeking to obtain a loan to finance a specific vehicle (as identified by its VIN) that was sold to the applicants by either Real Automobile Dealer-1 or Real Automobile Dealer-2 when, in fact, no such vehicle was so sold to the applicant.

17.    Based on my review of documents and information obtained from Lender-5, my conversations with representatives of Lender-5, my review of documents and information provided by the Banks in connection with the Bank Accounts, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

a.    Between on or about February 22, 2018 and on or about April 19, 2018, Lender-5 received two applications (the "Lender-5 Unfunded Applications") for the financing of vehicles other than those vehicles referenced in the twenty-five Lender-5 Funded Applications discussed in the preceding paragraph.  Each of the two Lender-5 Unfunded Applications falsely stated that the applicant was seeking to obtain a loan to finance a specific vehicle that was sold to the applicant by either Real Automobile Dealer-1 or Real Automobile Dealer-2 when, in fact, no such vehicle had been so sold.

b.    The two Lender-5 Unfunded Applications sought, respectively, two different loans that, in total, amounted to approximately $40,790.00 in financing.

## Defrauding of Lender-6

18.    Based on my review of documents and information obtained from a national financial institution ("Lender-6"), my review of documents and information provided by the Banks in connection with the Bank Accounts, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the

11

following:

        a.    Between on or about August 8, 2017, and on or about August 26, 2017, Lender-6 funded two automobile loans (the "Funded Lender-6 Loans") amounting to approximately $65,795.00, proceeds of which were deposited into Bank Account-1.

        b.    The corresponding applications (the "Lender-6 Funded Applications") for each of the two Funded Lender-6 Loans was on behalf of the names of two different individuals.  Each of the Lender-6 Funded Applications falsely stated that the applicants were seeking to obtain a loan to finance a specific vehicle (as identified by its VIN) that was sold to the applicants by either Real Automobile Dealer-1 or Real Automobile Dealer-2 when, in fact, no such vehicle was so sold to the applicant.

    19.  Based on my review of documents and information obtained from Lender-6, my personal involvement interviewing certain of the Borrower Victims and review of documents concerning the Borrower Victims, my conversations with representatives of the Real Automobile Dealers, my review of documents and information provided to me by the Real Automobile Dealers, and my training and experience, I have learned the following:

        a.    Between on or about September 11, 2017 and on or about February 6, 2018, Lender-6 received four applications (the "Lender-6 Unfunded Applications") for the financing of vehicles other than those vehicles referenced in the two Lender-6 Funded Applications discussed in the preceding paragraph.  Each of the four Lender-6 Unfunded Applications falsely stated that the applicant was seeking to obtain a loan to finance a specific vehicle that was sold to the applicant by either Real Automobile Dealer-1 or Real Automobile Dealer-2 when, in fact, the applicant never purchased a vehicle from Real Automobile Dealer-1 or Real Automobile Dealer-2.

        b.    The four Lender-6 Unfunded Applications sought, respectively, four different loans that, in total, amounted to approximately $90,826.00 in financing.

### The Aggravated Identity Theft of Real Person-1

    20.  Based on my review of documents and information obtained from Lender-5, my personal involvement interviewing certain of the Borrower Victims, including but not limited to

Real Person-1, and my training and experience, I have learned the following:

        a.    Real Person-1 only speaks Spanish and does not speak English. Real Person-1 is illiterate. He can neither read nor write.

        b.    In or about February or March 2018, Real Person-1 wanted to obtain a loan so that he could purchase a house but believed he would be unable to qualify for such a loan because he believed he had poor credit.

        c.    In or about March 2018, Real Person-1 met with DANIEL DURAN, the defendant, at an office in the Bronx, New York, with the hope that DURAN could assist Real Person-1 at improving his credit score so that Real Person-1 could qualify for a loan to assist him in purchasing a home. During this meeting, Real Person-1 provided DURAN with Real Person-1's Social Security number, which Real Person-1 was led to believe DURAN would use to check Real Person-1's credit.

        d.    After in or about March 2018 when Real Person-1 first met with DURAN, DURAN called Real Person-1 and told Real Person-1, in substance and in part, that Real Person-1 should obtain a loan to buy a vehicle on behalf of DURAN's company, because doing so would help improve Real Person-1's credit score. DURAN told Real Person-1, in substance and in part, that the purchase of the vehicle would be made with a loan in the name of Real Person-1, but that DURAN's company—rather than Real Person-1—would make all payments on the loan. Real Person-1 agreed to obtain a loan for the purchase of an automobile under the belief, based on DURAN's representations, that Real Person-1 would not be responsible for repaying the loan and that, in fact, DURAN's company would repay the loan.

        e.    On or about April 26, 2018, DURAN drove Real Person-1 to a bank branch of Lender-5 located within the Southern District of New York, where DURAN introduced Real Person-1 to an individual matching the description of RICARDO TABOADA, the defendant, who was already inside the bank branch. Thereafter, DURAN left the bank branch, and Real Person-1 remained inside the bank branch with the individual matching the description of TABOADA.

        f.    As Real Person-1 sat with the individual matching the description of TABOADA inside the bank branch of Lender-5, the individual matching the description of TABOADA instructed

Real Person-1 to sign certain documents and to provide his Social Security number, which Real Person-1 did.  The documents Real Person-1 signed were in English, and no one provided Real Person-1 with a copy of the documents in Spanish or read the documents to Real Person-1 (given his illiteracy) prior to his signing them.

        g.   On or about April 26, 2018, an application (the "Real Person-1 Loan Application") was submitted to Lender-5 on behalf of Real Person-1, reflecting his Social Security number and signature, for a loan to finance the purchase of a vehicle that Real Person-1 did not own, was not intending to purchase, and never purchased.

        h.   On or about April 27, 2018, Lender-5 approved the loan sought in the Real Person-1 Loan Application (the "Real Person-1 Loan") and issued a check for $35,140.00 listing Real Automobile Dealer-1 as the payee, with Real Person-1's name in the memorandum line.

        i.   On or about April 30, 2018, the check issued by Lender-5 in connection with the Real Person-1 Loan was deposited into Bank Account-3.[1]  No proceeds from the Real Person-1 Loan have ever been provided to Real Person-1.

        j.   To date, DURAN has not provided Real Person-1 with any payment for Real Person-1 to use in paying off the Real Person-1 Loan.  As of November 2018, Real Person-1 remained liable for the debt incurred through the issuance of Real Person-1 loan.

[Intentionally left blank]

---

[1] As noted above, ¶ 7.e, Bank Account-3 was opened in the name of a limited liability corporation incorporated in Colorado and accepting process at an address in the Bronx, New York, where TABOADA and DURAN had an office where they engaged, with others known and unknown, in their scheme to defraud others.

21.   Based on the facts set forth in the preceding paragraph (¶ 20), I believe RICARDO TABOADA and DANIEL DURAN, the defendants, conspired to deceive Real Person-1 into providing TABOADA and DURAN with Real Person-1's Social Security number so that TABOADA and DURAN could use that Social Security number in furtherance of their scheme to defraud Lender-5.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of RICARDO TABOADA and DANIEL DURAN, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

_____
ASHLEY K. BOROFSKY
Postal Inspector
Postal Inspection Service

Sworn to before me this
6ᵗʰ day of February, 2019

_____
HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK